UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JEFFREY FULKERSON                                                    Plaintiff

v.                                                    Civil Action No. 3:23-cv-520-RGJ

KEEGAN KIRKPATRICK, et al.                                        Defendants

* * * * *

## MEMORANDUM OPINION & ORDER

Defendants Keegan Kirkpatrick ("Kirkpatrick") and Brian Voils ("Voils") (collectively "Defendants") move for partial summary judgment on Counts 2, 3, and 5 of Plaintiff Jeffrey Fulkerson's ("Fulkerson") complaint against them. [DE 32]. Fulkerson responded [DE 39], and Defendants replied [DE 46]. Separately, Fulkerson filed a motion to exclude Defendants' expert testimony. [DE 36]. Defendants responded [DE 44], and Fulkerson replied [DE 47]. Briefing is complete, and the matters are ripe. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Fulkerson's motion to exclude Defendants' expert [DE 36] and **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for partial summary judgment [DE 32].

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The parties agree that on October 16, 2022, Nelson County Sheriff's Office ("NCSO") Deputy Kirkpatrick, along with deputies Brandon Jewell ("Jewell") and Ryan White ("White"), were dispatched to Fulkerson's residence in response to a potential domestic dispute. [DE 32-1 at 174; DE 39 at 697]. Kirkpatrick testified that the deputies were aware of an active emergency protective order ("EPO") against Fulkerson, and upon arriving at his residence, Fulkerson admitted to having a wife or girlfriend inside. [DE 32-2, Kirkpatrick Dep., at 200]. After speaking with

1

Fulkerson's girlfriend—Angie Fenech ("Fenech")—the deputies placed Fulkerson under arrest for violating the EPO. [*Id.*].

A security camera positioned by Fulkerson's backdoor, facing what appears to be a driveway, captured portions of the interaction between Kirkpatrick and Fulkerson. [DE 32-3]. In the video, an unidentified officer can be heard explaining the arrest to Fulkerson off-camera and repeatedly telling Fulkerson to "listen" while Fulkerson asks questions and states "I'm confused." [*Id.* at 00:00:01–00:00:15]. The officer can be heard stating "this will help your hearing with the EPO shit, but you still have to go to jail because we have no choice, 'cause you're having contact with her." [*Id.* at 00:00:51]. The video then shows Fulkerson stepping out of his house and into the camera frame and stating "I called dispatch today as well sir and confirmed with them and you can check my call log, I confirmed with them earlier," apparently attempting to explain his understanding of the EPO; namely, that he believed he did not violate the order because Fenech had been the one to initiate contact. [*See* DE 36-2, Fulkerson Dep. at 629–30]. Kirkpatrick, speaking over Fulkerson, states "I want to make something clear here." [*Id.* at 00:00:59–00:01:07]. The two continue to speak over one another, becoming increasingly loud. [*Id.* at 00:01:08–00:01:17]. Deputy Kirkpatrick then waves Fulkerson on, saying "let's go," and Fulkerson begins to walk before stopping and turning back, asking Deputy Kirkpatrick "what is your name?" [*Id.* at 00:01:16]. While Kirkpatrick responds, Fulkerson repeats himself, yelling "what is your name?" to which Deputy Kirkpatrick responds with "dude." [*Id.* at 00:01:20]. Fulkerson then says, "fuck you, you're on my property." [*Id.* at 00:01:22]. Next, Kirkpatrick can be seen moving toward and grabbing Fulkerson. [*Id.* at 00:01:23]. At that point, Fulkerson and Kirkpatrick go off camera, and the subsequent events are disputed by the parties. Although not visible, Fulkerson can be heard yelling "get off me" and "you're sued," while Kirkpatrick can be heard telling Fulkerson to "get

up." [*Id.* at 00:01:26–00:01:32]. Fulkerson can also be heard repeatedly yelling for "Pineiroa"—the NCSO Sheriff—and stating "I'm asking for your superior." [*Id.* at 00:01:40–00:01:55].

Fulkerson alleges that Kirkpatrick rushed him, punched him in the gut, and tackled him to the ground, causing Fulkerson to hit his head on some machinery outside. [DE 1 at 4]. Fulkerson states that the "very beginning" of the assault can be seen on the video footage, but that "the actual strike and tackle are just out of frame." [DE 39 at 697]. Fulkerson also asserts that Fenech witnessed the assault and attempted to use her phone to record the incident, but was prevented from doing so by another officer who shined his flashlight into her phone. [*Id.* at 698]. In support of this allegation, Fulkerson submits a brief cellphone video in which Fulkerson is seen on the ground yelling and a flashlight is beamed toward the camera. [DE 40]. Kirkpatrick, on the other hand, claims that he used "soft empty hand control" to take control of Fulkerson and escort him to the police car. [DE 39-6, Def.'s Resp. to Interrogs., at 745; DE 39-3, Kirkpatrick Dep., at 724]. He contends that he never tackled Fulkerson, and that Fulkerson simply "dropped to the ground and began screaming loudly." [DE 39-6 at 745; DE 39-3 at 724].

After the encounter between Kirkpatrick and Fulkerson and while Fulkerson was on the ground, Sergeant Voils arrived on the scene, not having witnessed the incident. [DE 39-4, Voils Dep., at 734]. Voils testified that he got Fulkerson to his feet to escort him to the patrol vehicle and told Fulkerson that he would not speak to him until he calmed down and stopped yelling. [*Id.*]. Once Fulkerson calmed down, he told Voils that Kirkpatrick "hit [him]" and stated that he wished to file a complaint. [*Id.* at 734-35]. Fulkerson alleges that Voils told him that he could file a complaint but that Voils would "have to file additional charges against [Fulkerson] for falsifying a statement against [his] deputy." [DE 32-6, Fulkerson Dep., at 222]. Fearing prosecution,

Fulkerson did not file a complaint. [*Id.*]. Voils testified that he merely gave Fulkerson a standard warning that filing a false report can result in additional charges. [DE 32-5, Voils Dep., at 220].

At some point after Voils arrived on scene, he and Kirkpatrick were captured on Fulkerson's security camera. [DE 32-7]. The video depicts Kirkpatrick saying "I said 'look, I don't wanna hear another word,'" and Voils "shushing" him while Voils shines his flashlight toward the ground. [*Id.* at 00:00:02].  Voils can then be heard saying "see if we can find his phone," at which point Kirkpatrick states "I have it in my hand" and holds out a phone. [*Id.* at 00:00:05]. The parties then leave the camera frame. [*Id.* at 00:00:10]. Fulkerson claims that the video depicts Kirkpatrick "start[ing] to make up a story" about the assault and Voils "shush[ing] Kirkpatrick because Voils knew that they were being recorded by Fulkerson's home security cameras." [DE 32-6 at 223; DE 39 at 698]. Voils testified that he shushed Kirkpatrick because he was trying to find Fulkerson's phone, not because he was concerned about Kirkpatrick incriminating himself. [DE 32-5 at 217].

Pursuant to these events, Fulkerson brought a complaint alleging (1) Section 1983 excessive force against Kirkpatrick; (2) Section 1983 supervisory liability against Voils; (3) Conspiracy to violate Fulkerson's Fourth Amendment rights against both Defendants; (4) Battery against Kirkpatrick; and (5) Negligent supervision and training against Voils. [DE 1 at 6-10]. Defendants filed a motion for partial summary judgment as to Counts 2, 3, and 5. [DE 32-1].

To support their motion for partial summary judgment, Defendants retained Brian Batterton as a "police practices expert." [DE 32-1 at 177]. In assessing Fulkerson's claims, Batterton reviewed NCSO's General Directives Manual and Kirkpatrick's personnel file, including his training records, annual evaluation, and response to resistance reports. [*Id.*]. In their motion for partial summary judgment, Defendants rely heavily on the report prepared by Batterton, which opined that Voils supervised the incident and Kirkpatrick in accordance with generally

4

accepted police practice and that Kirkpatrick was trained in accordance with generally accepted police practice. [*Id.* at 177-78]. In response, Fulkerson noted that many of the documents relied on by Batterton in producing his report, though disclosed in Defendants' initial disclosures, were never produced to Fulkerson, even after Fulkerson specifically requested them in interrogatories. [DE 39 at 699-700; *see also* DE 39-6 at 752]. Realizing their mistake, Defendants then filed a motion for leave to file supplemental disclosures as well as the following list of supplemental initial disclosures:

> (1) Deputy Kirkpatrick's personnel file in Nelson County
> (2) Defendant Kirkpatrick's personnel file in LaRue County;
> (3) Sergeant Voils' personnel file;
> (4) EPO Documentation 22-D-00162;
> (5) Plaintiff's records from NCDC 10-16-2022;
> (6) 10-15-2022 call from Plaintiff to Nelson County Dispatch;
> (7) NCSO Directives Manual;
> (8) Plaintiff 2022 CFS Log;
> (9) Plaintiff Citation 9-12-2024
> (10) Redacted Body Camera Footage 9-12-2024;
> (11) Plaintiff CFS Log 12-1-2022
> (12) Fulkerson Call History 4-1-2025

[DE 42; DE 42-1]. Fulkerson opposed the motion and filed his own motion to exclude the untimely filed evidence. [DE 50]. After full briefing on the matter, the magistrate judge granted in part and denied in part the Defendants' motion to file supplemental disclosures. [DE 56]. The Court allowed production of supplemental disclosures with respect to items (8)-(12) and denied the Defendants' request with respect to items (1)-(7).

In light of the magistrate judge's order, many of the materials relied upon by Batterton in creating his report—and thus relied upon by Defendants in their motion for summary judgment— are inadmissible and must not factor into the Court's ruling on the motion. While Batterton's opinions as to generally accepted police practices are admissible, any opinion based on the NCSO manual or Kirkpatrick's or Voils' personnel files are excluded. Consequently, the Court will

disregard portions of the Defendants' motion for partial summary judgment that refer to Batterton's opinions on these documents.

Shortly after Defendants filed their summary judgment motion, Fulkerson filed a motion to exclude Defendants' expert. [DE 36]. Because Defendants rely on Batterton's expert report in their motion for partial summary judgment, the Court will first resolve the motion to exclude Batterton's expert testimony and then resolve the motion for summary judgment.

## II.    MOTION TO EXCLUDE EXPERT TESTIMONY

A. <u>Standard</u>

The admissibility of expert testimony is set forth in Rule 702 of the Federal Rules of Evidence.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and internal quotation marks omitted). The Sixth Circuit has interpreted the *Daubert* line of cases as establishing a three-part requirement for expert testimony: "First, the witness must be qualified by knowledge, skill, experience, training, or education. Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517,

6

528-29 (6th Cir. 2008) (citations omitted) (quoting Fed. R. Evid. 702)). To determine if expert

testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue,"

the Court asks whether there is a "'fit' between the inquiry in the case and the testimony." *United*

*States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993). "[E]xpert testimony that does not relate to any

issue in the case is not relevant and therefore not helpful." *Id.*

B. <u>Discussion</u>

Batterton's report contains three opinions:

(1) [B]ased upon the facts and reasons contained Paragraphs 25 through 41 . . . a reasonable and well-trained law enforcement officer would be acting consistent with generally accepted police practice and training in using soft-empty-hand control to escort Fulkerson to a police vehicle for transport to jail.

(2) [B]ased upon the facts and reasons contained Paragraph 45 through 52 . . . Sergeant Voils supervised the October 16, 2022 incident involving Jeffrey Fulkerson in accordance with generally accepted police practice . . . and that Sergeant Voils supervised Deputy Kirkpatrick according to generally accepted police practice, based on Kirkpatrick's Annual Evaluation and Response to Resistance reports documented and reviewed by Sergeant Voils.

(3) [B]ased on . . . the information discussed in Paragraphs 56 and 58 . . . Deputy Kirkpatrick was trained in accordance with generally accepted police practice for his position as a Nelson County Sheriff's Deputy.

[DE 28-2 ¶¶ 24, 44, 55]. Fulkerson moves to exclude each of Batterton's opinions based on the

argument that the opinions are not helpful to the jury and thus not relevant. [DE 36-1 at 616].

Fulkerson also argues that Batterton's first opinion constitutes an improper legal conclusion and

that all his opinions improperly invade the province of the jury by accepting the Defendants'

version of events as true. [*Id.* at 616-18]. The Court will address each of Batterton's opinions

below.

*1. Batterton's First Opinion Regarding the Use of Soft-Empty-Hand Control*

Fulkerson asserts that "there is only one pertinent question or issue" in this case: "which

version of events is true?" [DE 36-1 at 613]. He states that "if Fulkerson's version is true, the

Defendants are obviously liable," and concedes that "if the Defendants' version is true, they are obviously not liable." [*Id.* at 613-14]. As a result, Fulkerson argues that Batterton's opinion that an officer's use of soft-empty-hand control would be consistent with generally accepted police practice is not helpful to the jury because it will not help the trier of fact determine whether Fulkerson's or Kirkpatrick's version of events is true. [*Id.* at 614]. In other words, Fulkerson states that the relevant question is whether Kirkpatrick used soft-empty-hand control, not whether such a tactic would be reasonable. Defendants assert that proving excessive force requires evidence that an officer's actions were objectively unreasonable, and Batterton's testimony will assist the jury in assessing the reasonableness of Kirkpatrick's actions. [DE 44 at 772]. They contend that without Batterton's testimony, "the jury will not have any metric by which to judge the perception of a reasonable officer on the scene." [*Id.* at 773].

To determine whether Kirkpatrick violated Fulkerson's Fourth Amendment rights, the jury will have to determine not only which actions Kirkpatrick took but also whether those actions were objectively reasonable. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[C]laims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest . . . of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard."); *Hopper v. Phil Plummer*, 887 F.3d 744, 752 (6th Cir. 2018) ("When assessing excessive-force claims under the Fourth or Fourteenth Amendments . . . we inquire whether the plaintiff has shown 'that the force purposely or knowingly used against him was objectively unreasonable.'" (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). This reasonableness inquiry requires a "balanc[ing] [of] the consequences to the individual against the government's interests in effecting the seizure." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). Factors include "the severity of the crime at

issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)).

Even if the jury believes Kirkpatrick's version of events, it is not necessarily "obvious to any reasonable juror" that he is not liable, as Fulkerson claims, nor is it a requisite that Kirkpatrick *is* liable if the jury believes Fulkerson's version of events. [DE 36-1 at 615]. Batterton's report explains how law enforcement officers are generally trained to make investigatory stops, provides factors that officers must consider when determining how much force is necessary, and provides information on the "use of force continuum"—the different levels of force officers are trained to use in different situations. [DE 28-2 at 94]. The report also explains how officers are trained to handle domestic dispute calls—the type of call that officers were responding to in this case. This information will help jurors understand how a trained officer would behave in the situation, and, upon determining which version of events they believe, whether Kirkpatrick acted reasonably. The jury can use the opinion about training standards as a guide, but it does not go to the ultimate issue of, and is not determinative of, whether the officer acted reasonably and does not equate to a finding that the officer acted unreasonably. *See Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 680, 691 (E.D. Mich. 2011) ("It may be helpful to the jury, for example, to know that . . . [d]eputies are expected to escalate the use of force along a certain a continuum under a certain given set of circumstances. But whether or not Deputy Simpkinson's conduct in this case was unreasonable given those guidelines is a decision that only the jury is competent to make . . . [the expert] will be prohibited from expressing any legal conclusions, which either explicitly or implicitly embrace the ultimate legal issue in this case of whether Deputy Simpkinson's conduct was reasonable under the totality of the circumstances which he faced.").

Moreover, Batterton's testimony may help the jury in assessing which version of events is more plausible. The video footage of the incident only captures the beginning of the altercation between Kirkpatrick and Fulkerson, so jurors will be tasked with determining the facts of what occurred out of frame. Understanding Kirkpatrick's on-camera behavior and whether his behavior aligns with generally accepted police practices may help jurors assess which version of off-camera events they find more credible. This is particularly relevant given that one of Plaintiff's arguments is that Kirkpatrick can be seen "rushing" Fulkerson in the video and that this action makes Fulkerson's version of events more likely. [DE 39 at 706]. Batterton's testimony will help the jury understand whether this type of "rushing" behavior is standard police practice, or whether it suggests the beginning of an unconstitutional assault. Accordingly, Batterton's first opinion is admissible to the extent that it outlines general training practices for law enforcement, the use of force continuum, training for domestic dispute calls, and his assessment of how an officer would perceive the threat level in the situation and the appropriate response to such threat.

Fulkerson's argument that Batterton's report improperly invades the province of the jury by basing his opinions on Defendants' version of events is unavailing. It is a generally accepted principle that an expert witness may not offer an opinion on the credibility of a witness because it invades the province of the jury. *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019). At the same time, "[e]xperts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence. *Richman v. Sheahan*, 415 F. Supp. 2d, 929, 942 (N.D. Ill. 2006). "There is a critical distinction between an expert testifying that a disputed fact actually occurred or that one witness is more credible than another and an expert giving an opinion based upon factual assumptions, the validity of which are for the jury to determine." *Id.*; *see also In re Air Disaster at Lockerbie, Scotland*, 37 F.3d 804, 825–826 (2d Cir.

1994) ("Pursuant to Rule 704 . . . an opinion based on a disputed fact may not be excluded simply because it pertains to an issue to be decided by the jury."); *Fetty v. City of Baton Rouge*, 518 F. Supp. 3d 923, 934 (M.D. La. 2021) (noting that an expert would improperly usurp the jury's role by "not only bas[ing] his opinion on an assumption that his client's version of events is true, but to actually adopt and endorse that version of events"). The advisory notes to Federal Rule of Evidence 702 also recognize that [w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendments. Thus, Batterton may, assuming the Defendants' version of events is true, offer his opinion as to whether Kirkpatrick's actions align with generally accepted police practices. Batterton may not, however, "adopt and endorse" Defendants' version of events, as this would invade the jury's role. *Fetty*, 518 F. Supp. 3d at 934.

The fact that Batterton bases his conclusions on Defendants' version of events does not prevent the jury from making its own credibility determination or accepting Fulkerson's version as true. Batterton recognizes in his report that "there are two widely different versions of events as to what occurred after Deputy Kirkpatrick began to escort Fulkerson," and opines as to whether Kirkpatrick's telling of the incident aligns with generally accepted police practices. [DE 28-2 ¶ 43]. His opinion states not that Kirkpatrick *did* use soft-empty-hand control, but that a well-trained officer "*would be* acting consistent with generally accepted police practice and training in using soft-empty-hand control." [*Id* ¶ 24 (emphasis added)]. In other words, Batterton bases his opinions on an assumption that one version of events is true—which is permitted under the Rules—not an explicit endorsement of that version. Outright exclusion of this testimony by the Court would not be appropriate, particularly when "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530. Rather, Fulkerson may challenge this

testimony in court through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

However, to the extent that Batterton opines as to the reasonableness of Kirkpatrick's actions, it is not admissible. Although the Federal Rules of Evidence allow an expert's opinion to "embrac[e] an ultimate issue," the Sixth Circuit has held that this "reference must be to stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). The Sixth Circuit has stated that expert testimony that "a reasonable officer on the scene would not have concluded . . . that there existed probable cause" expressed an improper legal conclusion because "objective reasonableness is the precise legal standard of *Graham*" to be applied by the jury. *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 426 (6th Cir. 2006); *see also Summerland v. Cnty. of Livingston*, 240 F. App'x 70, 81 (6th Cir. 2007) (expert opinion that force was not "reasonable" was an inadmissible legal conclusion). The court has also excluded expert testimony in a § 1983 excessive force case that an officer's conduct was not "justified under the circumstances," not "warranted under the circumstances," and "totally improper" because they "merely [told] the jury what result to reach." *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (quoting Fed. R. Evid. 704).

Batterton's first opinion states that a "*reasonable* and well-trained law enforcement officer would be acting consistent with generally accepted police practice . . . in using soft-empty-hand control." [DE 28-2 ¶ 24 (emphasis added)]. The opinion, much like the testimony at issue in *DeMerrell* and *Hygh*, tells the jury what result to reach using the *Graham* reasonableness standard. Because "objective reasonableness" is the exact standard under which the jury will be asked to

judge Kirkpatrick's actions, Batterton is prevented from concluding that his actions were objectively reasonable. Consequently, Batterton's testimony as to whether Kirkpatrick's asserted conduct aligned with generally accepted police practices is admissible, but Batterton's testimony that such conduct was "reasonable" is an inadmissible legal conclusion.

Finally, while it does not appear that Batterton's first opinion relies on any of the items excluded by the magistrate judge [DE 56], the Court notes that any testimony referencing those documents will be inadmissible.

### 2. Batterton's Second Opinion Regarding Whether Voils Acted in Accordance with Generally Accepted Police Practice

Batterton's second opinion states that "Sergeant Voils supervised the . . . incident involving Jeffrey Fulkerson in accordance with generally accepted police practice" and that "Voils supervised Deputy Kirkpatrick according to generally accepted police practice, based on Kirkpatrick's Annual Evaluation and Response to Resistance reports documented and reviewed by Sergeant Voils." [DE 28-2 ¶ 44]. Fulkerson argues that this opinion is not helpful to the jury because he "entirely adopts the Defendants' version of events" and ignores Fulkerson's claim that Voils threatened to bring additional charges. Once again, Fulkerson asserts that it is "obvious to any reasonable juror" that Defendants are not liable if they are telling the truth, and Batterton's opinion is not relevant to that question. [DE 36-1 at 615]. Defendants respond that the testimony will "give the jury a baseline understanding of what training, supervision, and investigation look like in the context of police practices standards," which will assist the jury in determining whether Voils knowingly acquiesced to unconstitutional conduct of a subordinate. [DE 44 at 774].

To hold a supervisor liable for a violation of a plaintiff's constitutional rights, there must be (1) knowing acquiescence to the unconstitutional conduct by the supervisor; (2) a causal connection between supervisor's acts and the deprivation of rights, and (3) a deprivation of a

clearly established right. *See Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016). Acquiescence can be established by evidence that a superior failed to investigate allegations of excessive force or attempted to cover up the unconstitutional conduct. *See id.* at 243.

Here, Fulkerson's argument fails for the same reasons stated above. Batterton may properly render an opinion based on an assumption that is at odds with Fulkerson's version of events—i.e., that Voils did not threaten Fulkerson. Batterton's opinion gives the jury an understanding of how supervisors are typically expected to respond to and investigate such incidents, which will allow the jury to determine whether Voils acted in accordance with those practices and thus whether he "knowingly acquiesced" to unconstitutional conduct. As a result, Batterton's testimony is relevant and admissible to the extent that it opines as to generally accepted police practices and whether Voils acted in accordance with such practices in supervising the incident.

However, to the extent that Batterton's opinion relies on now-excluded evidence, it is not admissible. Batterton cites to the NCSO general directives manual and Kirkpatrick's personnel files [DE 28-1 ¶¶ 46–54], both of which are excluded pursuant to the magistrate judge's order [DE 56]. As a result, Batterton may no longer rely on these documents in rendering any of his opinions.

3. *Batterton's Third Opinion as to Whether Kirkpatrick was Trained in Accordance with Generally Accepted Police Practice*

As to Batterton's third opinion, Fulkerson reasserts his argument that the opinion is not helpful because Batterton simply adopts the Defendants' version of events and "concludes that if the Defendants are telling the truth, they are not liable." [DE 36-1 at 615-16].

As stated above, Batterton may rely on the assumption that Defendants' version of events is true in giving his opinion. Moreover, testimony as to whether Kirkpatrick was trained in accordance with generally accepted practices would be directly relevant to the question of whether Voils properly supervised Kirkpatrick. However, Batterton's third opinion is based almost

exclusively on Kirkpatrick's personnel files from the NCSO and the LaRue County Sheriff's Office [DE 28-2 ¶¶ 56–58], both of which have been excluded [DE 56]. To the extent that Batterton's opinion relies on these documents, it is inadmissible. The Court recognizes that Kirkpatrick may have personal knowledge of his training to which he can testify. If that is the case, Batterton may opine as to whether those training practices align with generally accepted practices, provided he does not rely on the excluded documents.

* * *

As set forth above, Batterton's first opinion is admissible, except to the extent that it incorporates an improper legal conclusion that Kirkpatrick acted reasonably or to the extent that it relies on excluded evidence. Batterton's second and third opinions are admissible only to the extent that they do not rely on excluded evidence.

### III.    MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants ask the Court to grant summary judgment with respect to Fulkerson's supervisory liability, civil conspiracy, and negligent training and supervision claims. [DE 32-1 at 173]. They assert first that Fulkerson has not met his burden of proof as to those claims and thus summary judgment is warranted as a matter of law. [*Id.*]. They further contend that even if Fulkerson were able to meet his burden of proof, Voils is entitled to qualified immunity as to all claims against him. [*Id.* at 174].

At the outset, the Court notes that Defendants' motion relies heavily on the NCSO general directives manual and Kirkpatrick's personnel files, as well as portions of Batterton's report that cite to those documents. Because the NCSO general directives manual and Kirkpatrick's personnel files are excluded, the Court will not consider them or Batterton's opinions on them in ruling on the motion for summary judgment.

A.    Standard

1. *Summary Judgment*

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion.  *Id.* at 252.

The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party.  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).  But the nonmoving party must do more than show some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Liberty Lobby*, 477 U.S. at 252.

Rule 56(c)(1) requires that a "party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

2. *Qualified Immunity*

"Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). When advanced by a defendant, qualified immunity is a threshold question of law appropriately determined on a motion for summary judgment. *Harlow v. Fitzgerald*, 457 U.S. 800 (1983). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The plaintiff bears the ultimate burden of proof in establishing that a defendant has no right to qualified immunity. *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)). That said, in moving for summary judgment based on qualified immunity, a defendant must first show "facts to suggest that he acted within the scope of his discretionary authority during the incident in question." *Id.* The burden then shifts to the plaintiff to show "that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct." *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017). If "undisputed facts show that the defendant's conduct did indeed violate clearly established rights[,]" or "if there is a factual dispute . . . involving an issue on which the question

17

of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights[,]" a court must deny summary judgment. *Gardenhire*, 205 F.3d at 311 (quoting *Poe v. Haydon*, 853 F.2d 418, 425–26 (6th Cir. 1988) (citations omitted)).

The Supreme Court requires a two-pronged approach when resolving questions of qualified immunity, although courts may decide the order in which to address these prongs "in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. First, the Court must decide whether a plaintiff has presented facts sufficient to find a violation of a constitutional right. *Id.* at 232. The Court views this evidence in the light most favorable to the plaintiff. *See Shreve*, 743 F.3d at 134. Second, the Court must decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Thus, qualified immunity applies unless the official's conduct violates a clearly established constitutional right. *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). If the court finds that the plaintiff's right was not clearly established, the court can start with the second factor and does not "need to determine whether the alleged conduct was in fact unconstitutional." *Schulkers v. Kammer*, 955 F.3d 520, 532 (6th Cir. 2020) (citing *Pearson*, 555 U.S. at 236–43)).

B.   Discussion

1. *Section 1983 Supervisory Liability (Count 2)*

Fulkerson alleges that Voils "authorized, encouraged, and caused" Kirkpatrick to violate Fulkerson's constitutional rights by refusing to investigate, punish, or properly supervise Kirkpatrick and by threatening to charge Fulkerson with a crime if he complained about Kirkpatrick's misconduct. [DE 1 at 7]. Defendants argue first that Fulkerson has failed to establish a claim for supervisory liability against Voils. Specifically, they contend that Fulkerson has not demonstrated that Voils knowingly acquiesced to unconstitutional conduct or that there is any

causal connection between Voils' conduct and Fulkerson's alleged injuries. [DE 32-1 at 183–86]. Defendants also argue that Voils' actions were protected by qualified immunity. [*Id.* at 190-91].

To establish supervisory liability in a § 1983 action, "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984). "An official cannot be held liable for the constitutional violations of subordinates under a theory of *respondeat superior*." *Venema v. West*, 133 F.4th 625, 633 (6th Cir. 2025).  In other words, supervisory liability "must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998)). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy¸* 729 F.2d at 421. Evidence of a supervisor's failure to investigate, failure to properly train or supervise officers, or attempt to cover up unconstitutional conduct are sufficient to show that a supervisor "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of his subordinates." *Peatross*, 818 F.3d 233 (6th Cir. 2016).

Fulkerson points to several pieces of evidence that establish a genuine issue of material fact with respect to whether Voils authorized or knowingly acquiesced to unconstitutional conduct by Kirkpatrick. First, Fulkerson testified in his deposition that Voils threatened to file charges against him if Fulkerson filed a complaint against Kirkpatrick. [DE 39 at 702; DE 39-1 at 719]. Defendants counter that Voils merely warned Fulkerson of the consequences of making a false report and that, according to Batterton, "warning Plaintiff of the consequences of making a false report is not contrary to generally accepted police practice." [DE 32-1 at 176, 184]. Defendants

point to Voils' testimony that he gave Fulkerson the standard warning of "if we find out you're lying about this, we're going to charge you." [DE 32-5, Fulkerson Dep., at 220]. Thus, both parties agree that Voils made some statement to Fulkerson regarding the prospect of filing additional charges against Fulkerson; they disagree on whether Voils' statement was merely a warning or a threat intended to cover up Kirkpatrick's misconduct. If Voils' statement was in fact a threat, his conduct could constitute an attempt to cover up unconstitutional conduct of his subordinate, which would establish "implicit authoriz[ation], approv[al], or knowing[] acquiesce[nce]" to his subordinate's unconstitutional conduct. *See Peatross*, 818 F.3d 233 (6th Cir. 2016). The fact that Voils disputes Fulkerson's characterization of his statement as a "threat" merely shows that a genuine dispute exists regarding whether he attempted to cover up unconstitutional conduct. While it may be true that "warning Plaintiff of the consequence of making a false report is not contrary to generally accepted police practice," it is up to a jury to decide whether Voils "warned" or "threatened" Fulkerson.

Second, Fulkerson points to the video footage of Voils "shushing" Kirkpatrick. [DE 39 at 702; DE 32-7]. Fulkerson contends that "when taken in the light most favorable to Fulkerson, [the shushing] could be interpreted as Voils silencing Kirkpatrick in order to prevent him from making inculpatory statements on camera." [DE 39 at 702]. Defendants assert that there is no evidence to suggest that, at the time of the video, Voils had any knowledge of the alleged use of force, and therefore the shushing cannot form the basis for "knowing acquiescence." [DE 32-1 at 185]. Yet, in the video, Kirkpatrick can be heard telling Voils, "I said 'look, I don't wanna hear another word,'" at which point Voils shushes him. [DE 32-7 at 00:00:01–00:00:04]. A jury could reasonably find that this video shows Kirkpatrick beginning to tell Voils what happened with Fulkerson and then Voils silencing him. While Voils contends that he shushed Kirkpatrick so he

could focus on finding Fulkerson's phone, the Court is required at this stage to view the evidence in the light most favorable to the non-moving party. Viewing the video in the light most favorable to Fulkerson, it could reasonably be interpreted as Voils attempting to prevent Kirkpatrick from incriminating himself.

Defendants assert that Fulkerson fails to point to any authority that either Voils' warning or the shush were unconstitutional, but rather "relies on a speculative, conclusory statement that a jury could, in theory, believe that the warning and the shush were unconstitutional." [DE 46 at 788]. They point out that there is nothing unlawful about "an officer warning a civilian of the consequences of making a false report" or "a supervisor instructing an officer not to make a statement regarding an alleged use of force at a specific moment." [*Id.* at 789]. But both arguments are based on Defendants' self-serving interpretation of the evidence—that Voils merely "warned" Fulkerson and "instruct[ed]" Kirkpatrick to delay making a statement. A jury could reasonably interpret Voils' actions consistent with Fulkerson's interpretation, and if so, could find that his actions constituted an attempt to "cover-up the unconstitutional conduct of his subordinate[]"— and thus form the basis for knowing acquiescence. *See Peatross*, 818 F.3d at 243 (denying qualified immunity where a supervisor "attempted to cover-up the unconstitutional conduct of his subordinates").

Fulkerson has also established a genuine dispute of material fact with respect to whether there is a causal connection between Voils' conduct and Kirkpatrick's alleged constitutional violation. "A causal connection is established when the supervisor's conduct, or lack thereof, 'could be reasonably expected to give rise to just the sort of injuries' that a plaintiff alleges have occurred." *Venema*, 133 F.4th at 633 (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 790 (6th Cir. 2012)). A supervisor need not have been "'actively involved' in the incidents directly

causing the injury to the plaintiff" for a causal connection to exist. *Peatross*, 818 F.3d at 244 (quoting *Campbell*, 700 F.3d at 790). For instance, in *Peatross*, the court found that there was a causal connection between a supervisor's actions and the constitutional violation when there was evidence that the supervisor "rubber stamped" officer misconduct because this behavior "could reasonably be expected to give rise to just the sort of injuries that occurred." *Id.* In this case, a jury could reasonably find that find that Voils "rubber stamped" or attempted to protect Kirkpatrick from the consequences of his alleged misconduct, and that these actions could reasonably be expected to give rise to the sort of injuries Fulkerson alleges. That is, a jury could find that a superior's endorsement or concealment of an officer's use of excessive force could result in officers using excessive force against detainees. The fact that Voils was not on site when the incident occurred and was not actively involved with Kirkpatrick's direct conduct does not preclude his liability, given that Voils witnessed the direct aftermath of the incident with Fulkerson on the ground and "tacit or implicit authorizations" of unconstitutional behavior and "failure to take precautions against likely violations" suffice to establish supervisory liability. *Does v. Whitmer*, 69 F.4th 300, 307 (6th Cir. 2023).

It is for these same reasons that Voils' qualified immunity argument fails with respect to Fulkerson's supervisory liability claim. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Defendants argue that Voils is entitled to qualified immunity because the evidence does not show that he violated any constitutional right of Fulkerson or played any role in Kirkpatrick's alleged violation. [DE 32-1 at 191]. But, as detailed above, there is a genuine dispute of material fact as to whether Voils

attempted to cover up Kirkpatrick's alleged misconduct and thus whether he participated in the unconstitutional conduct. Because "summary judgment would not be appropriate if there is a factual dispute . . . involving an issue on which the question of immunity turns," summary judgment is not appropriate here, where there is a factual dispute as to whether Voils threatened Fulkerson and whether he attempted to shield Kirkpatrick from liability by "shushing" him. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (quoting *Poe v. Haydon*, 853 F.2d 418, 425–26 (6th Cir. 1988).

As a result, Defendants' motion for summary judgment is denied as to Count 2.

### 2. *Civil Conspiracy (Count 3)*

Defendants argue that the evidence is insufficient to support a claim for civil conspiracy because (1) "[t]here is no testimony or discovery to support the conclusion" that Voils and Kirkpatrick had a single plan to violate Fulkerson's rights, (2) the evidence does not show that Kirkpatrick had a reason to believe his supervisors would shield him from complaints, and (3) Voils complied with standard practices in responding to the incident. [DE 32-1 at 188-89]. Fulkerson responds that there is sufficient circumstantial evidence that, viewed in the light most favorable to him, precludes summary judgment. [DE 39 at 706]. Fulkerson points to four pieces of circumstantial evidence: (1) the video of the incident in which Kirkpatrick is seen "rushing Fulkerson," (2) Fulkerson's testimony that Voils threatened him with additional charges, (3) the footage showing Voils "shushing" Kirkpatrick, and (4) the fact that "neither Defendant has a working memory of many of the events of the incident." [*Id.* at 706-07].

A civil conspiracy claim under § 1983 arises where there is "an agreement between two or more persons to injure another by unlawful action." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). To prevail on a civil conspiracy claim, a plaintiff must show "'that (1) a single plan existed,

(2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed' in furtherance of the conspiracy that caused the injury." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Revis*, 489 F.3d at 290). "Plaintiffs are not required to prove an express agreement among all the conspirators" or that all conspirators knew all the "details of the illegal plan or participants involved." *Id.* at 622 (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). Moreover, plaintiffs may "rely on circumstantial evidence to establish an agreement among conspirators." *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012). Still, "conspiracy claims must be pled with some degree of specificity" and "vague and conclusory allegations unsupported by material facts" are not sufficient to support a § 1983 conspiracy claim. *Id.* (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)).

Here, though it is a close call, there remains a genuine dispute as to whether Voils and Kirkpatrick acted under a shared plan to violate Fulkerson's rights. The pieces of evidence that Fulkerson points to in support of conspiracy, when considered individually, fail to show the existence of a single plan or a shared a conspiratorial objective between Kirkpatrick and Fulkerson. For example, Voils' alleged threat against Fulkerson and his "shushing" of Kirkpatrick may show that Voils intended to cover up unconstitutional conduct, but they do not by themselves show that Voils and Kirkpatrick conspired to cover up the conduct. Similarly, the footage of Kirkpatrick "rushing" Fulkerson may support Fulkerson's independent excessive force claim against Kirkpatrick, but it does not alone reveal a shared objective between Kirkpatrick and Voils. Finally, the mere fact that the Defendants both independently lacked certain memories of the incident does not on its own suggest a shared scheme. However, when those same pieces of evidence are considered together, they provide sufficient circumstantial evidence of a shared plan to cover up unconstitutional conduct to preclude summary judgment. *See Webb v. United States*, 789 F.3d 647,

671 (6th Cir. 2015) (noting that "each of the alleged misdeeds" of the defendants "may have occurred independently, they are sufficiently intertwined so as to suggest an agreement between the perpetrators").

First, Defendants do not dispute that there is genuine dispute as to whether Kirkpatrick violated Fulkerson's constitutional rights by rushing him and tackling him. [DE 32-1 at 175 n.1]. That, combined with the video of Voils shushing Kirkpatrick, Voils' alleged threat of additional charges, and both parties' lack of memory of the incident in deposition testimony creates a dispute with respect to whether Voils and Kirkpatrick acted under a common plan to cover up unconstitutional conduct. While there is no evidence that Voils and Kirkpatrick agreed to deprive Fulkerson of his constitutional rights before Kirkpatrick's initial violation, the existing evidence, viewed in the light most favorable to Fulkerson, does raise a question as to whether Voils and Kirkpatrick had a shared plan to escape liability *after* Kirkpatrick's violation. As Fulkerson points out, Kirkpatrick stated that he could not recall numerous facts about the incident during his deposition, including whether he spoke to Voils about the incident, who handcuffed Fulkerson and transported him to the detention center, and who filled out the response to resistance report. [DE 39 at 698 n.3; DE 39-3 at 724–726, 728]. Likewise, Voils could not remember whether there was an investigation into Kirkpatrick, whether he spoke to Fenech about the incident, and who filled out the response to resistance report. [DE 39 at 699; DE 39-4 at 733, 735]. Both parties' lack of memory about the incident, coupled with evidence that Voils shushed Kirkpatrick and threatened Fulkerson in a possible attempt to protect Kirkpatrick, provides sufficient circumstantial evidence of a shared objective to cover up a constitutional violation—and overt acts in furtherance thereof—to avoid summary judgment.

For these same reasons, qualified immunity does not protect Defendants from the civil conspiracy claim. There is sufficient evidence to create a genuine issue of material fact regarding whether Defendants violated Fulkerson's constitutional rights by covering up an excessive use of force, and Fulkerson's right to be free from excessive force was clearly established at the time.

While it is a close call, the circumstantial evidence provides enough support of civil conspiracy to warrant consideration by a jury. Accordingly, the Court denies summary judgment as to Count 3.

### 3. Negligent Supervision and Training (Count 5)

Defendants claim they are entitled to summary judgment on Fulkerson's state law negligent training and supervision claim. [DE 32-1 at 189]. Fulkerson does not challenge Defendants' motion as to that claim. [DE 39 at 701 n.6]. A plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *Hicks v. Concorde Career Coll.,* 449 F. App'x. 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin,* 178 F. App'x. 522, 524–25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim); *Conner v. Hardee's Food Sys.,* 65 F. App'x. 19, 24–25 (6th Cir. 2003). However, such a failure does not automatically entitle the movant to judgment. *Kemper v. City of Jackson*, Tennessee, No. 1:22-CV-02689-MSN-JAY, 2025 WL 336211, at *6 (W.D. Tenn. Jan. 24, 2025). A court must still determine whether the movant has demonstrated the absence of a genuine dispute of material fact through proper evidentiary designations. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). While a party's failure to respond to specific

arguments can indicate abandonment, it does not relieve the court of its duty to ensure that summary judgment is appropriate based on the properly supported material facts cited by the moving party. *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 403–07 (6th Cir. 1992). The scope of this review, however, is not unlimited. Courts are not required to search the entire record *sua sponte* for genuine disputes of material fact but must examine the evidence properly designated by the moving part to determine if summary judgment is warranted. *E.g.*, *Street*, 886 F.2d at 1479–80 (citing *Anderson*, 477 U.S. 242; *Celotex Corp.*, 477 U.S. 317; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).

To establish a claim for negligent supervision and training under Kentucky law, "the plaintiff must allege that the defendant knew or had reason to know of the employee's harmful propensities; that the employee injured the plaintiff; and that the hiring, supervision, or retention of such an employee proximately caused the plaintiff's injuries." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005), (quoting 27 Am. Jur. 2d *Employment Relationship* § 401 (2004)). "[A]n employer may be held liable for the negligent supervision of its employees 'only if he or she knew or had reason to know of the risk that the employment created.'" *Carberry v. Golden Hawk Transp. Co.*, 402 S.W.3d 556, 564 (Ky. App. 2013) (quoting *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003)).

In his deposition, Kirkpatrick testified that he has never been investigated for misconduct, had a complaint filed against him, or been disciplined in either his position at NCSO or his former position with the LaRue County Sheriff's Office. [DE 32-2 at 199]. Additionally, there is no evidence in the record suggesting that Voils knew or had reason to know that Kirkpatrick had "harmful propensities." *See Grand Aerie*, 169 S.W.3d at 844. Without any evidence that Voils knew or had reason to know of the risk that employment of Kirkpatrick created, there is no genuine

27

dispute of material fact with respect to whether Voils negligently supervised Kirkpatrick. Consequently, Defendants have established the absence of a genuine dispute on Count 5, and given Fulkerson's lack of response, summary judgment is warranted.

Accordingly, the Court grants summary judgment as to Count 5.

### IV.    CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1. Fulkerson's motion to exclude expert testimony [DE 36] is **GRANTED IN PART** regarding Batterton's testimony that relies on excluded evidence and Batterton's legal conclusion that a reasonable officer would be acting consistent with generally accepted police practice in using soft-empty-hand-control and **DENIED IN PART** on all other grounds.

2. Defendants' motion for partial summary judgment [DE 32] is **GRANTED IN PART** with respect to Count 5 and **DENIED IN PART** with respect to Counts 2 and 3.

Rebecca Grady Jennings, District Judge
United States District Court

October 24, 2025

28